**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SADIA, S.A., | : | Civil Action No. |
| | : | 06-3831(FLW) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **AMENDED OPINION** |
| HUBBARD FARMS, INC., <u>et</u> <u>al.</u>, | : | |
| | : | |
| | : | |
| Defendants. | : | |

<u>**WOLFSON, District Judge**</u>:

Plaintiff Sadia, S. A. ("Plaintiff" or "Sadia") acquired Granja Rezende, S.A. ("Granja"), a Brazilian company that was in the business of breeding "grandparent" chickens, which at one time had been supplied by Defendant Hubbard Farms, Inc. ("Hubbard").[1] Granja then sold the parent offspring to its customers as breeding stock. In the late 1990s, a disease, known as the AL J virus, affected the poultry industry worldwide, and it negatively impacted the business relationship between Granja and Hubbard. Plaintiff alleges that the "grandparent" chickens supplied by Hubbard were infected by the AL J virus, which in turn infected the breeding

---

[1] Defendant Hubbard LLC also moves to dismiss Plaintiff's Complaint. Defendant's motion is granted because the Court finds that the claims asserted by Plaintiff are barred by certain agreements entered into between the parties, and that Hubbard LLC was not in existence during the relevant time of the dispute in this case. Accordingly, Hubbard LLC is dismissed as a defendant.

stock.   Sadia filed the instant suit seeking indemnification and contribution from Hubbard and its successor entities, Hubbard Farms, LLC and Merial LLC (collectively, "Defendants"), for claims brought by three of Sadia's customers in Brazil, and Plaintiff also seeks declaratory relief.   Defendants move for dismissal of Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, summary judgment.   For the reasons that follow, Defendants' motion for summary judgment is **GRANTED** in its entirety.

### BACKGROUND

For the purposes of this Motion, the facts are derived from the Amended Complaint and taken as true.   Plaintiff is a Brazilian company that produces chilled and frozen foods and is the successor-in-interest to Granja.   Amended Compl. at 1.   Granja was merged into Sadia in August 2002.   Id.   Each of the defendant entities was or is a Delaware company engaged in the "business of breeding poultry for sale to breeders in the United States and abroad."   Id. at ¶¶ 3-6.[2]   All of the defendants did or do business

---

[2]

The relationships between the various defendants are described in Plaintiff's initial Complaint.   Defendant Hubbard Farms, Inc. was a subsidiary of Merck & Co. from 1974 until July 1997. Compl. at ¶ 4.   Merck and Phone-Poulenc, S.A. combined their animal health business to form Merial Limited as of August 1997.   Id. at 5.   As a part of the resulting reorganization, Hubbard Farms, Inc. ceased to exist and was merged into defendant Hubbard Farms LLC in July 1997.   Hubbard Farms LLC was then merged into Merck Transitory LLC, which in turn was merged into defendant Merial LLC ("Merial") in August 1997.   Id. at ¶¶ 6-8.   Defendant Merial is a Delaware limited liability company, and is in the business of developing and marketing veterinary pharmaceuticals and vaccines.   From August

in New Jersey.  Id.

On or about January 1, 1978, Granja and Hubbard entered into a Breeding Stock Lines Sale and Distribution Agreement (the "1978 Agreement").  Id. at ¶ 9.  Hubbard agreed to supply day-old "grandparent" breeding chickens to Granja as breeding stock.  From breeding these grandparent chicks, Granja produced the female line of "parent" breeding stock that it delivered to other breeders in Brazil and Uruguay, along with a male line of "parent" breeding stock that Granja purchased from a different supplier.  See the 1978 Agreement at ¶¶ VII-X, XIL.  Granja customers would breed the male and female "parent" stocks supplied by Granja to produce broilers.  Id.

Pursuant to the 1978 Agreement, Granja and Hubbard agreed that Hubbard would supply breeding chickens to Granja under the terms, conditions and restrictions as specified in the Agreement.  Id. ¶ II.  Those terms and conditions included an indemnification clause in which Granja agreed to "hold the Breeder [Hubbard] harmless from any and all claims against it arising from the conduct of the Importer [Granja]."  Id. at ¶ XVI.  In addition, Granja agreed:

> As between the Breeder and the Importer, the Importer
> shall take full responsibility for any all claims for
> adjustments or replacements or otherwise arising (I)
> from the Importer's sales of parent stock produced
> from matings of grandparent stock supplied by the

1997 until December 1998, an unincorporated division of Merial known as Hubbard ISA was the successor to Hubbard Farms, Inc. in the production and sale of poultry breeding stock to Granja and other customers.  Id. at ¶¶ 9-10.

> Breeder hereunder and (ii) in connection with any progeny of said parent stock.

Id.

Significant issues with the Hubbard stock began in 1996, when Hubbard's "grandparent" stock allegedly became infected with the AL J virus.  Amended Compl. at ¶ 16; see also Scarpelini Decl. at ¶ 40.  In late 1996, Hubbard became aware that its breeding stock was infected with a virus, Id., and the virus complicated Granja's business.  Plaintiff claims that the AL J Virus can be spread both "vertically" - from a female chicken to her offspring - and "horizontally" - between chickens that are housed together."  Scarpelini Decl. at ¶ 37.  Because Granja used all of the female grandparent chickens supplied by Hubbard, Plaintiff claims that, "the infection level was an average [of] 41%" within the grandparent stock, and that Hubbard's "grandparent breeding lines were one source of this virus from June of 1996."  See March 5, 1998 Agreement between Granja and Hubbard (the "March 1998 Agreement").

In March 1998, after Granja complained about the ill health of the chickens supplied by Hubbard, Hubbard and Granja entered into the March 1998 Agreement.  Pursuant to the Agreement, Hubbard acknowledged that Granja had "documented significant losses within its operation from the presence of the [AL J] virus."  See the March 1998 Agreement.  As such, Hubbard agreed to reimburse Granja for 41% of the invoice value of the flocks that Granja demonstrated

4

were infected up to the date of the March 1998 Agreement.  This amounted to $2.9 million, with $1.5 million paid by check and $1.4 million to be provided by supplies of stocks without charge.  In return, Granja agreed that "[t]his agreement <u>settle[d] all claims related to [the virus] for flocks suppled [by Hubbard]</u> up to the date of this Agreement [i.e., March 5, 1998]."  <u>See</u> the March 1998 Agreement (emphasis added).[3]

Approximately six months later, in light of the continuing AL J virus problems, Granja and Hubbard entered into a second agreement (the "November 1998 Agreement").  In that particular agreement, Hubbard granted Granja "an additional delay of six calendar months" on invoices totaling more than $725,000 because Granja was delinquent in payments owed to Hubbard.  <u>See</u> the November 1998 Agreement.  In addition, Hubbard agreed to pay Granja $472,213 and accepted delayed payment of outstanding invoices in lieu of re-payment.  <u>Id.</u>  Again, in return, Granja granted Hubbard a release, which stated: "There will be no additional penalties or damages to either party against the other resulting from this agreement or relating to any stock supplied by Hubbard up to the date of the Agreement (i.e., November 1998)."  <u>Id.</u> at p. 2. In addition, the November Agreement provided for termination of the parties' business relationship under the 1978 Agreement, effective

_____

[3]Plaintiff maintains that the March 1998 Agreement did not exculpate Hubbard from all misconduct, but simply settled the amount to reimburse Granja for its payment for infected flocks.

5

December 31, 1999.[4]  <u>See</u> Fishcer Decl., Ex. D; <u>see</u> <u>also</u> Gascoyne Decl., Ex. D.

## PROCEDURAL HISTORY

Plaintiff's Complaint in this case was served in December 2006.  The initial Complaint asserted ten causes of action, including claims for breach of contract, fraud and conspiracy, and claims for indemnification and contribution.  Defendants moved to dismiss the Complaint, and/or for summary judgment.  Instead of defending the motion, Plaintiff filed an Amended Complaint which no longer asserts any breach of contract, fraud, tort or conspiracy claims.  However, the Amended Complaint continues to assert claims for indemnification and contribution.  Those claims are the subject of the instant motion.

In particular, Plaintiff seeks indemnification (Count I) and contribution (Count II) for three lawsuits against Granja by its former customers:

1.   A suit by Cooperativa Regional Agropecuaria Languiru Ltda., which was settled on June 5, 2005 for approximately U.S. $375,000.  Amended Compl. at ¶ 27.

2.   A suit by Alimenta Avicola, S.A., which resulted in a judgment of approximately U.S. $3,210,000.  <u>Id.</u> at ¶ 28; <u>see</u> Fischer Decl., Ex. F.  The appellate court affirmed

---

[4]As of December 31, 199, Granja allegedly continued to owe Hubbard a balance of $1,245,715.35.

6

the lower court's decision on liability, but directed that damages be re-calculated. <u>See</u> Gelernter Decl., Ex I at pp. 5-7, § 1.3.

3.    A pending lawsuit by Seara Alimentos S.A.  According to the Amended Complaint, this suit seeks damages of approximately U.S. $21, 5000,000. Amended Comp. at ¶ 29.

Count III of the Amended Complaint, a claim for declaratory judgment, alleges that Plaintiff "faces the possibility of additional liability" from other suits that might be brought in the future by unnamed customers of Granja,  Amended Compl. at ¶¶ 44-45, and seeks a declaration that Plaintiff is entitled to indemnification and contribution from Hubbard for "any future claim" that might be brought by customers of Granja who purchased the offspring of chickens supplied by Hubbard.  <u>Id.</u> at ¶ 47.

## DISCUSSION

### I.   Standard of Review: Motion to Dismiss and Summary Judgment

Defendants move to dismiss Plaintiff's claims, or in the alternative move for summary judgment.  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). Recently, in <u>Bell Atlantic Corporation v.</u>

_Twombly_, 127 S.Ct. 1955 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in _Conley v. Gibson_, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Id._ at 1968 (quoting _Conley_, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." _Id._ at 1965. As the Third Circuit has stated, "[t]he Supreme Court's _Twombly_ formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." _Phillips_, 515 F.3d at 234 (quoting _Twombly_, 127 S.Ct. at 1965).

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); _Celotex Corp. v. Catrett_, 477 U.S. 317, 322 (1986); _Kreschollek v. S. Stevedoring Co._, 223 F.3d 202, 204 (3d Cir. 2000). In deciding whether summary judgment should be granted, the Court considers

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," Fed. R. Civ. P. 56(c), and construes all facts and inferences in the light most favorable to the nonmoving party. <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002). The Court's function "at the summary judgment stage . . . is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). To successfully defend against a motion for summary judgment, a plaintiff cannot merely rely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. <u>Id.</u> at 252.

## II.  Choice of Law

There is no doubt that the actual injuries alleged in this case occurred in Brazil.  However, the 1978 Agreement specifically set forth that New Hampshire law shall apply.  <u>See</u> the 1978 Agreement at ¶ XIX ("This Agreement (including its construction and performance) and any arbitration shall be governed by the substantive law of the State of New Hampshire").  Accordingly, as an important preliminary matter, this Court "sitting in diversity must apply the conflicts of law principles of the forum state." <u>Henry v. Richardson-Merrell, Inc.</u>, 508 F.2d 28, 31 (3d Cir. 1975). Because New Jersey is the forum state, its conflict of law principle shall apply.

Under New Jersey law, a flexible "governmental-interest" test is used to decide a choice-of-law question.  Fu v. Fu, 160 N.J. 108, 118 (1999).  The purpose of this test is to ensure that "the determinative law is that of the state with the greatest interest in governing the particular issue."  Veazey v. Doremus, 103 N.J. 244, 248 (1986).  New Jersey courts follow a two-step analysis.  Henry, 508 F.2d at 32.  First, the court must determine whether there are any conflicts between the laws of the states that are potentially interested in the dispute, and the choice-of-law inquiry is conducted on an issue-by-issue basis.  Erny v. Estate of Merola, 171 N.J. 86, 100 (2002).  Where there is a conflict of laws, the court must then identify the policies underlying the law of each potentially interested state and determine if those policies are related to the parties' contacts with that jurisdiction. See Gantes v. Kason Corp., 145 N.J. 478, 487 (1996).  "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply."  Veazey, 103 N.J. at 248; see also Hoffman Equipment, Inc. v. Clark Equipment Co., 750 F. Supp. 1222, 1230 (D.N.J. 1990), aff'd, 935 F.2d 1281 (3d Cir. 1991) ("A state is deemed 'interested' only where application of its law to the facts in issue will foster that state's policy").  In other words, the "[s]tate interest analysis focuses on whether application of the state's law under the circumstances of the particular case will

10

advance the policies that the law was intended to promote." General Ceramics, Inc. v. Firemen's Fund Ins. Cos., 66 F.3d 647, 656 (3d Cir. 1995).

Specifically regarding choice-of-law clauses, New Jersey choice of law rules generally permit the parties to a contract to choose which state's law will govern issues arising out of that contract. Alcman Servs. Corp. v. Bullock, 925 F. Supp. 252, 259 (D.N.J. 1995). "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey will uphold the contractual choice if it does not violate New Jersey's public policy." Id. (quoting Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 341 (1992)). In this regard, New Jersey follows the Restatement (Second) of Conflicts of Laws § 187, which provides that a contractual choice of law provision will be enforced as long as the forum bears a reasonable relationship to the parties of the transaction and the application of the law of the chosen state would not violate a fundamental policy of a state which has a materially greater interest than the chosen state and whose law would otherwise apply. See Instructional Systems, 130 N.J. at 342.

Here, there are three separate agreements (i.e, the 1978 Agreement, the March 1998 Agreement and the November 1998 Agreement) at issue. Defendants argue that the express choice-of-law provision, which specified New Hampshire law, set forth in the

1978 Agreement should govern each of the agreements.  On the other hand, Plaintiff maintains that Brazilian law applies.

**A.   The 1978 Agreement**

The 1978 Agreement's choice-of-law provision specifies New Hampshire law as the governing law for the "construction and performance" of the Agreement.  While New Hampshire, Hubbard's place of business, bears more than a "reasonable relationship" to the parties or the transaction, it is debatable whether New Hampshire would have a materially greater interest than Brazil, especially since, all of the alleged injuries took place in Brazil. This is particularly true, since it would appear that Brazil would have a greater interest than New Hampshire in protecting Brazil's chicken supplies, as this is a matter of health and safety for its citizens, i.e., food borne illness.  Nevertheless, it also appears that Plaintiff does not argue against New Hampshire law applying to the 1978 Agreement; indeed, Plaintiff's legal expert on Brazilian law, Paul Cezar Aragao, states in his Declaration that "the 1978 Agreement is regulated by New Hampshire law."  See Aragao Decl. at p. 13; see also Plaintiff's Brief in Opposition to Defendants' Motion at p. 24.  As such, the Court shall apply New Hampshire law to the 1978 Agreement.

The issue pertaining to the 1978 Agreement arises out of the indemnification clause, which states:

> The Importer (Granja) shall hold the Breeder (Hubbard) harmless from any and all claims against it

12

> arising from the conduct of the Importer.  As between the Breeder and the Importer, the Importer shall take full responsibility for any all claims for adjustments or replacements or otherwise arising (i) from the Importer's sales of parent stock produced from matings of grandparent stock supplied by the Breeder hereunder and (ii) in connection with any progeny of said parent stock.

See the 1978 Agreement at ¶ XVI.  Defendants argue that this provision is dispositive of Plaintiff's claims as it completely forecloses any remedy against Hubbard by expressly stating that Granja must indemnify Hubbard.  Plaintiff, on the other hand, takes issue with the phrase of the clause "arising from the conduct of [Granja]," and argues that the claims asserted in the Amended Complaint do not arise from the conduct of Granja but from the conduct of Hubbard.

As a matter of contractual principle, New Hampshire law is settled: "to constitute a clear and unambiguous waiver, the language must disclaim the specific obligation that the waiving party seeks to avoid . . . Thus the waiving party has the responsibility of announcing his disclaimer in language that leaves no doubt . . . ."  Anderson v. Century Prods. Co., 943 F. Supp. 137, 150 (D.N.H. 1996).  Accordingly, if a contract's exculpatory clause is not clear and unambiguous on its face that a defendant is to be released from liability for its own acts, then there is "an issue of fact" that is inappropriate to be resolved on a motion to dismiss or summary judgment.  Wright v. Loon Mountain Recreation Corp., 140 N.H. 166, 169 (1995).

Here, the indemnification clause is ambiguous as to the rights of the parties under the facts of this case.  The first sentence of the clause releases Hubbard only for claims "arising from the conduct of [Granja]" – not from the conduct of Hubbard.  Even though the following sentences of the clause refer more expansively to releases given to Hubbard, nonetheless, these provisions may be read to explain the limitation of the first sentence, i.e., that Hubbard is not liable to third-parties for Granja's actions.  In addition, the language of the clause does not expressly state that Hubbard has no "liability" for claims based on its own conduct.  Such ambiguity creates a factual dispute that must be resolved by a trier of fact to determine the parties' intent at the time when the 1978 Agreement was drafted.  Wright, 140 N.H. at 169.  Importantly, Hubbard's own actions show that it did not necessarily believe that the 1978 Agreement absolved it of liability for its own actions because in 1998, when confronted with proof that the chickens supplied by Hubbard to Granja were infected, Hubbard did not seek to avoid liability by pointing to the indemnification clause, but rather it settled certain claims with Granja in the March 1998 and November 1998 Agreements.  Of course, this is not dispositive, because the parties may have so acted because of other business purposes.  However, in so doing, Hubbard never referred to the 1978 Agreement.  The Court, therefore, turns to the two subsequent agreements to determine how they impact the rights and

14

liabilities of the parties.

### B.    The March 1998 and November 1998 Agreements

Similar arguments were posited by both parties with regard to the choice of law applicable to the March and November 1998 Agreements.  Specifically, Defendants argue that the because the dispute arises from the performance of the 1978 Agreement, and because the parties agreed that New Hampshire law governs that agreement, these subsequent agreements should also be governed by New Hampshire law, even when there is a lack of a choice-of-law provision.  In response, Plaintiff argues that absent such a clause, and because the agreements were signed in Brazil and the alleged injuries took place in Brazil, Brazilian law should necessarily govern the agreements.  Without the necessity of conducting a choice-of-law analysis, although the Court believes Brazilian law would likely apply here, the Court finds that even construing the agreements in the light most favorable to Plaintiff by applying Brazilian law, the 1998 March and November Agreements released all claims against Hubbard asserted by Plaintiff in this case.

Neither party disputes the existence of the 1998 March and November Agreements.  Indeed, Granja and Hubbard entered into the March 1998 Agreement after the AL J virus became prevalent in the poultry industry.  In the agreement, Hubbard agreed that its "grandparent" breeding lines were one source of this virus from

chicken supplies sent to Granja between June 1996 and October 1997. See the March 1998 Agreement.  Hubbard agreed to reimburse Granja approximately $2.9 million.  Id.  Both parties further agreed that "[t]o protect [Granja] and its customers and Hubbard from further claims, Hubbard agrees to supply to [Granja] test kits to identify birds positive for [AL J] strain exogenous virus, until mutually agreed by both parties that [AL J] strain in Hubbard stock is no longer an issue."  Id.  As a result, Granja agreed that the March 1998 Agreement "settle[d] all claims related to [AL J] strain for flocks supplied up to the date of this agreement."  Id. (emphasis added).

Moreover, both parties entered into the November 1998 agreement, whereby Hubbard agreed to extend an additional six months for Granja to pay certain invoices.  See the November 1998 Agreement at ¶ 2.  In addition, Hubbard agreed to pay Granja $472,213.  Id.  In return, Granja agreed that "[t]here will [be] no additional penalties or damages to either party against the other resulting from this agreement or relating to any stock supplied by Hubbard up to the date of the Agreement."  Id. at ¶ 5.

Defendants argue that the express language of these agreements bar any claims brought by Plaintiff in this suit since the alleged injuries arose from the "grandparent" stock supplied by Hubbard prior to the March and November 1998 Agreements.  Plaintiff, on the other hand, does not dispute that the lawsuits brought by Granja's

former customers involve no shipment of chickens outside the agreements' effective dates, but rather, it argues that under Brazilian law, the two 1998 Agreements could not settle, in advance, uncertain or hypothetical rights, which did not exist at the time the settlements were executed.  The Court now turns to the analysis of Brazilian law on this issue.

The parties rely on their own legal experts on Brazilian Law. While both experts disagree on the outcome of the dispute, nonetheless, the Court finds that their respective recitations of Brazilian law are similar.  In fact, even under the analysis set forth by Plaintiff's expert, Aragao, the two 1998 agreements would preclude the claims brought by Plaintiff.  In his Declaration, Arago set forth the Brazilian legal framework with respect to settlement and indemnification.  He explains:

> The principal characteristic of settlement agreements is the renunciation of rights. Considering the possible consequences of renunciation, these agreements are treated carefully under Brazilian law, which expressly restricts their interpretation under art. 843 of the Brazilian Civil Code of 2002, in order to limit the extent of the rights affected by the renunciation.  (<u>See</u> Aragao Decl. at p. 14.)
>
> . . .
>
> First, the settlement is taken to apply only to matters to which the parties made explicit reference, or which naturally flow from matters explicitly referred to. (<u>Id.</u> at p. 15.)
>
> . . .
>
> Second, a renunciation of rights is never presumed. Especially, in cases of doubt, any assumption that rights

17

have been renounced would offend the rule established in said art. 843 of the Civil Code and very logic of settlement agreements . . . . (<u>Id.</u>)

. . .

Third, even where the parties have used broad and general language in an attempt to pull in any and all rights, settlement provisions cannot be interpreted literally. The restrictive interpretation imposed by the law means that the renunciation contained in the settlement will affect only the rights known and contested in the situation or legal proceedings that the settlement sought to <u>prevent</u> or to bring to an end. (<u>Id.</u> at pp. 15-16.)

. . .

Forth, and lastly, a settlement, by virtue of its restrictive interpretation, cannot settle, in advance, uncertain or hypothetical rights, which do not exist at the time the settlement was entered into and which may, or may not, materialize. (<u>Id.</u> at p. 16.)

. . .

In sum, based on the foregoing Brazilian legal principles, Aragao concludes that "the parties would be taken to have settled on the amount of indemnification Granja Rezende was entitled to for losses that had materialized at the time the agreement was made," because the two 1998 settlement agreements cannot extend to future, uncertain damages that might never occur. <u>Id.</u> at p. 19.

The crux of Plaintiff's argument is that under Brazilian law, a party cannot release another from liability for future unasserted claims.[5] According to Aragao's opinion, it appears that he opines

---

[5]

While Aragao explains that in his Declaration that the 1978 Agreement should be regulated by New Hampshire law, he nonetheless erroneously applied Brazilian law to argue that this agreement should not be used to preclude Defendants' liability because a

that all losses occurring after the two 1998 agreements would have to be considered new, and would not be covered by the settlements. If the Court were to accept such opinion, parties in Brazil would arguably never be able to enter into prospective (or preventive) settlement agreements; such is not the law in Brazil.  Rather, while the Court recognizes that settlements are to be construed restrictively, Brazilian Civil Code of 2002 authorizes the creation of "preventive" settlements.  Art. 840 of Brazilian Civil Code of 2002 ("Article 840.  The parties may prevent or terminate litigation by mutual waivers"); see Flavio Galdino Decl. at p. 16. The overarching purpose of settlements in Brazil, as it is here in the United States, is to "avoid the risks of litigation (including costs, time, chances of victory), in order to convert a state of uncertainty [to] a state of certainty." Galdino Decl. at p. 17. Indeed, within the Aragao Declaration, he identifies that not only does a settlement agreement extend to matters to which the parties refer explicitly, but it also extends to "the natural consequences of such matters."  Aragao Decl. at p. 15 (emphasis added).  In addition, Aragao concedes that "the object of a settlement must be the actual existence or the mere possibility of a dispute between the parties."  Id. at p. 16 (emphasis added).

_____

party cannot avoid liability for its own future grossly negligent conduct by entering into an agreement that limits indemnification or recourse rights.  See Aragao Decl. at p. 13.  Since the Court's determination does not take into account the effect of the 1978 Agreement, the Court need not address this contention.

Having found that Brazilian Civil Code permits settlement agreements of this nature, the Court next examines the language of the releases to determine whether they preclude claims asserted by Plaintiff in this case.[6] The parties expressly agreed to "settl[e] all claims related to [the virus] for flocks supplied up to the date of this agreement (i.e., March 1998)." They subsequently agreed that there would be "no additional penalties or damages to either party against the other." See the 1998 November Agreement at p.2. By the foregoing unambiguous language, the parties assented that any and all claims arising from the flocks supplied by Hubbard up to November 1998 were settled by the two agreements.[7]

---

[6]

Importantly, Brazilian's Superior Court of Justice has explained that "[w]hen settlement is done, full and general release is given for the sum received, due to payment of compensation without a court action, which release reaches all the monies and, after that, a supplementary sum, which would not be included in the payment receipt, is demanded. I believe that any such action should be strongly curtailed . . . It would be contrary to the law to admit the settlement concerning payment of compensation, including all the monies, with a later claim to the effect that release did not include this or that sum." Galdino Decl. at p. 13 (citing Superior Court of Justice, Case: Recurso Especial nr. 728.361-RS, Reporting Judge Carlos Alberto Menezes Direito, unanimous judgment on June of 2005).

[7]

Plaintiff argues that the parties did not intend to release the claims at issue because the $2.9 million settlement was too small to have been intended as a release from future liability and because Hubbard failed to obtain a more precise release. To demonstrate its point, Plaintiff cites a contract case, in which Hubbard was a party, in the Southern District of New York. Plaintiff argues that Hubbard, in that case, drafted a general release in a contract to specifically cover "all causes of action, suits, debts, dues, sums of money . . . against them and its affiliates . . . ever had, now have, or hereafter can, shall or may

The agreements did not link the release to damages incurred by that date, but rather encompassed any damages that could ensue as a result of the flocks supplied to that date. Obviously, if it included flocks to the date of the agreements, then the full consequences of those supplies could not have been known, yet, these future claims were nonetheless precluded. Therefore, logically, the damages asserted in the Brazilian lawsuits are squarely contemplated by the agreements. There is nothing hypothetical or uncertain about those claims made by Granja's former customers.

Indeed, when the two 1998 Agreements were entered into, the underlying facts which allegedly caused the damages had already occurred and the alleged infection of the supplied chicken flocks was already known - even if the extent of the damages was not yet known. Granja, at that time, knew exactly how many flocks were delivered and their destinations, including supplies to third

---

have . . . from the beginning of the world to the day of the date of this Agreement." See Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F.Supp. 2d 514, 523 (S.D.N.Y. 2001). To further support its contention, Plaintiff cites to only New Hampshire and New Jersey law, without citing to any Brazilian law. Despite its lack of legal foundation under Brazilian law, which Plaintiff argues governs the two 1998 agreements, the Court's inquiry here is whether the language of the releases is clear on its face to preclude the claims asserted by Plaintiff. As there is no requirement that a release include any particular "magic words" to be effective, as discussed further, infra, the Court finds that by looking to the four corners of the two agreements themselves, the language of the releases unambiguously bar Plaintiff from seeking indemnification and contribution from Defendants for the claims at issue.

parties.    Although  some  of  the  alleged  damages  had  not  yet
materialized  nor  were  they  precisely  quantified  (their  precise
amount  is  still  not  known),  they  were  at  least  foreseeable  to
Granja  during  the  settlement.    In  other  words,  Granja  knew  the
types  of  claims  that  could  ensue,  who  its  customers  were,  and  the
chain  of  propagation  for  the  flocks.    In  fact,  Granja  was  on  notice
of  at  least  one  of  the  underlying  claims  at  issue  before  entering
into  the  November  1998  Agreement.    See  Gelernter  Decl.,  Exs.  F,  G.
Specifically,  a  month  before  that  agreement,  a  letter  was  sent  to
Granja  by  one  of  its  customers,  who  is  now  involved  in  the  pending
Seara Alimnetos  suit,  notifying  Granja  that  it  had  suffered  losses
of  approximately  US  $9.9  million  from  the  Hubbard  line  of  chickens.
See  Letter  dated  October  7,  1998.    Even  knowing  that  it  might  face
this  tremendous  liability,  Granja  nevertheless  agreed  that  "[t]here
will  be  no  additional  penalties  or  damages  to  either  party  [Hubbard
or  Granja]  against  the  other  resulting  .  .  .  [from]  any  stock
supplied  by  Hubbard."    See  the  November  1998  Agreement  at  p.  2.
Thus,  when  the  settlements  were  executed,  the  only  thing  unknown
was  the  precise  amount  of  damages.    Yet,  that  is  what  settlements
accomplish,  they  are  compromises  often  made  without  knowledge  of
the  full  exposure.

Tellingly,  in  a  separate  lawsuit  initiated  by  Plaintiff
against  Alfredo  Rezende,  the  former  president  of  Granja,  Plaintiff
argued  before  a  Brazilian  court  that  in  accepting  the  March  1998

22

release, Granja "exempt[ed] [Hubbard] from the obligation for future reparations"; effected a "sale of the right of recourse"; and "absolv[ed] Hubbard of its duty to indemnify." <u>See</u> Gelernter Decl., Ex. E at ¶¶ I.8, I.12, II.1.6.  While the Court is not applying estoppel principles, it seems that Plaintiff's position here is at odds with the position it has taken in the lawsuit in Brazil.  Equally damming to the position taken by Plaintiff here is the decision in <u>Alimenta Avicola S/A v. Granja Rezende</u>, one of the underlying cases for which Plaintiff seeks indemnification or contribution, where the Brazilian court found that Granja had "releas[ed] [Hubbard] from any liability for any losses."  <u>See</u> Gelernter Decl., Ex. B at 2320.  Thus, it appears that Sadia's desire to undo the actions of its predecessor, Granja, motivates and underlies the initiation of this suit.  However, whether or not in hindsight, the decisions to enter into these agreements a decade ago were commercially sound, the parties are nonetheless bound by their terms.

Accordingly, the Court finds that the parties unambiguously settled their potential claims in the two 1998 agreements in order to prevent uncertain results of litigation.  Additionally, because the Court finds that Defendants do not have a legal duty to indemnify, or contribute to, the claims asserted by third-parties against Plaintiff, Sadia's claim for declaratory relief is also dismissed.

As a final note, if the Court were to apply the laws of New Hampshire, the result would be the same.  In New Hampshire, "a plaintiff may agree in advance that the defendant has no legal duty toward him and thereby assume the risk of injury arising from the defendant's conduct."  Barnes v. New Hampshire Karting Ass'n, Inc., 128 N.H. 102, 106 (1986).  Moreover, "[t]he parties need not . . . have contemplated the precise occurrence that resulted in the plaintiff's injuries" in order to effect a finding release.  Id. at 107.  With regard to contract interpretation, "[u]nless the agreement contains ambiguous terms," the parties' intent is ascertained from "the four corners of the document itself."  Dunn v. CLD Paving, Inc., 140 N.H. 120, 122 (1995).  Because the Court finds the language of the two 1998 settlement agreements unambiguous and valid under New Hampshire law, the agreements would release Hubbard from claims asserted by Plaintiff.

**CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment is granted in its entirety because the Court finds that the March 1998 and November 1998 Agreements released all claims asserted by Plaintiff against Defendants.


Dated: December 30, 2008


/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.